IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Trenisha Shetah Brown, | ) | C/A No.: 1:14-3472-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Commissioner of Social Security Administration, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Joseph F. Anderson, Jr., dated September 3, 2014, referring this matter for disposition. [ECF No. 11]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals.

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

# I.     Relevant Background

## A.     Procedural History

On August 3, 2011, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on February 6, 2011. Tr. at 77, 150–51. Her applications were denied initially and upon reconsideration. Tr. at 85–89, 93–95. On May 1, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Frances W. Williams. Tr. at 28–65 (Hr'g Tr.). The ALJ issued an unfavorable decision on June 27, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 9–27. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 28, 2014. [ECF No. 1].

## B.     Plaintiff's Background and Medical History

### 1.     Background

Plaintiff was 38 years old at the time of the hearing. Tr. at 32. She completed high school and a little over a year of college. Tr. at 34. Her past relevant work ("PRW") was as a customer service representative, a group leader, and a customer complaint clerk. Tr. at 60–61. She alleges she has been unable to work since February 6, 2011. Tr. at 35.

### 2.     Medical History

Plaintiff was diagnosed with Graves disease and underwent thyroid radiation therapy at age 22. Tr. at 454.

Plaintiff visited David H. Hammett, M.D. ("Dr. Hammett"), for intractable headaches on November 18, 2009. Tr. at 356. Dr. Hammett diagnosed intractable migraines and cervical muscle spasms and pain, including occipital neuralgia. *Id.* He recommended Triptan medications and Phenergan or Zofran, as needed, for nausea. *Id.*

Plaintiff presented to John F. Mattei, M.D. ("Dr. Mattei"), for neck pain and shoulder spasms on July 7, 2010. Tr. at 370. Dr. Mattei assessed discogenic cervical pain. *Id.* He used electrical muscle stimulation, myofascial release, joint mobilization, and mechanical traction. *Id.*

On July 20, 2010, Plaintiff presented to Stephen Tuel, M.D. ("Dr. Tuel"), with neck pain, numbness, and tingling radiating to her bilateral upper extremities. Tr. at 290. Foraminal compression test and Spurling's test were abnormal bilaterally. *Id.* Plaintiff had hypesthesia bilaterally at C6-7. *Id.* Her deep tendon reflexes were intact and equal. *Id.* She had positive Tinel's and Phalen's tests. *Id.* Electrodiagnostic testing revealed decreased amplitude of the right median and bilateral ulnar motor nerves. *Id.* Her left median sensory nerve showed decreased conduction velocity. *Id.* Dr. Tuel indicated the testing revealed evidence of bilateral median nerve entrapment at the wrist (carpal tunnel syndrome) and ulnar neuropathy. *Id.* He recommended conservative treatment to include manual medicine and possible injection therapy. *Id.*

Plaintiff underwent diagnostic laparoscopy with lysis of adhesions and right partial oophorectomy on August 4, 2010, after experiencing severe abdominal pain. Tr. at 264–65.

Plaintiff presented to Dr. Mattei for cervical pain and cervical brachial syndrome on August 26, 2011. Tr. at 321. Dr. Mattei noted bilateral trap spasm, levator scapular spasm, and cervical paraspinal spasm. *Id.* He observed Plaintiff to have positive Phalen's, Tinel's, and carpal pressure. *Id.* Plaintiff demonstrated reduced cervical range of motion ("ROM"). *Id.* Dr. Mattei indicated Plaintiff was scheduled for a breast reduction surgery and that he would inject her wrists after the surgery. *Id.*

On January 31, 2011, Plaintiff presented to Michael S. Green, M.D. ("Dr. Green"), for bilateral wrist pain and numbness and tingling in her fingers. Tr. at 283–84. Dr. Green indicated an electromyography ("EMG") and nerve conduction studies ("NCS") were difficult to interpret because they showed very low amplitudes with normal latencies. Tr. at 283. Plaintiff had full ROM of her interphalangeal ("IP") joints, no thenar eminence atrophy, negative Tinel's sign, and positive Phalen's sign. Tr. at 284. Dr. Green injected Plaintiff's carpal tunnel with Celestone and Xylocaine. *Id.* He assessed bilateral carpal tunnel syndrome. *Id.*

On February 9, 2011, Plaintiff presented to Sean Fuller, M.D. ("Dr. Fuller"), for neck pain. Tr. at 278–79. Dr. Fuller referred her for an MRI. Tr. at 279. The MRI indicated very mild degenerative disc disease of the cervical spine without significant compressive sequela; no more than minimal central canal stenosis and no more than mild bilateral foraminal stenosis at any level; and a mild diffuse disc bulge at T1-2 resulting in mild stenosis and mild bilateral foraminal stenosis. Tr. at 280–81.

4

An EMG on February 23, 2011, showed no sign of left or right carpal or cubital tunnel syndrome and did not suggest generalized polyneuropathy or cervical radiculopathy. Tr. at 286–87.

Plaintiff presented to Brett C. Gunter, M.D. ("Dr. Gunter"), for a neurosurgical consultation on March 2, 2011. Tr. at 273–74. She complained of left neck, shoulder, and arm pain, bilateral hand numbness, and daily headaches. Tr. at 273. Dr. Gunter observed Plaintiff to have loss of ROM in her neck and back. *Id.* Plaintiff had normal muscle strength in her bilateral upper and lower extremities, intact sensation to light touch, and symmetric and intact reflexes. Tr. at 274. A cervical MRI showed a left herniated nucleus pulposis in a large foramen at C6-7. *Id.* Dr. Gunter diagnosed presumed left C7 radiculopathy with significant additional neurological symptoms. *Id.* He recommended pain management and cervical epidural steroid injection. *Id.*

Plaintiff was examined by Eva Jane Rawl, M.D. ("Dr. Rawl"), at Carolina Spine Center on March 8, 2011. Tr. at 271–72. She complained of chronic neck pain that radiated between her shoulder blades, across her left shoulder, and into her left arm. Tr. at 271. She endorsed neck pain with extension, flexion, and lateral rotation of her neck. Tr. at 272. Plaintiff demonstrated point tenderness to deep palpation in her paraspinous muscles. *Id.* An MRI indicated minimal disc bulge that was slightly asymmetric to the right, but did not compress the cord or cause stenosis. *Id.* Dr. Rawl discussed with Plaintiff possible epidural steroid injections and Plaintiff expressed a desire to proceed with them. *Id.*

Plaintiff followed up with Dr. Green on March 25, 2011, to discuss the EMG and NCS results. Tr. at 288–89. Dr. Green assured Plaintiff that she did not have carpal tunnel syndrome and indicated no need for surgery. Tr. at 289. He recommended Plaintiff pursue cervical rehabilitation and physical therapy. *Id.*

Plaintiff presented to Dr. Fuller with lower back pain on May 3, 2011. Tr. at 319. On June 8, 2011, Dr. Fuller indicated Plaintiff had positive results for chronic fatigue syndrome. Tr. at 317. On June 14, 2011, Plaintiff presented to Dr. Fuller with an elevated temperature of 100.4 degrees. Tr. at 315. Dr. Fuller diagnosed chronic fatigue, other malaise and fatigue, and myalgia and myositis. Tr. at 316. He noted Plaintiff had a positive ANA test and referred her to a rheumatologist. *Id.*

Plaintiff presented to Dr. Hammett with migraine headaches and neck and back pain on July 29, 2011. Tr. at 340. She stated her headaches occurred daily and lasted for four or more hours. *Id.* Dr. Hammett prescribed 50 milligrams of Cambia and 10 milligrams of Diazepam. *Id.* He administered a greater occipital nerve block and scheduled Plaintiff for a Botox injection. Tr. at 340–42.

An MRI of Plaintiff's brain showed no abnormalities on August 4, 2011. Tr. at 343.

On August 11, 2011, Plaintiff presented to Dr. Fuller for follow up. Tr. at 309–10. Dr. Fuller assessed chronic migraine, fibromyalgia, insomnia, and cervicalgia. Tr. at 310.

Plaintiff presented to Dr. Hammett to review her MRI results on August 19, 2011. Tr. at 338–39. She indicated her headaches had improved since she received the occipital

nerve block. Tr. at 338. Dr. Hammett assessed chronic common migraine (without aura) with intractable migraine, muscle spasm, and torticollis. *Id.*

On August 29, 2011, Plaintiff complained to Dr. Fuller of being tired and having a fever for over a week. Tr. at 353. Dr. Fuller indicated Plaintiff's temperature was slightly elevated at 99.6 degrees. *Id.* Dr. Fuller assessed unspecified fever and fibromyalgia. Tr. at 354.

On September 7, 2011, Plaintiff reported to Dr. Hammett that she experienced severe migraines that lasted for several hours on a near-daily basis. Tr. at 336. Dr. Hammett administered Botox injections to several areas in Plaintiff's head and neck. Tr. at 336–37. Plaintiff followed up with Dr. Hammett for a greater occipital nerve block on September 29, 2011. Tr. at 335.

Plaintiff presented to rheumatologist Bruce Goeckeritz, M.D. ("Dr. Goeckeritz"), for pain and fatigue on October 26, 2011. Tr. at 324–25. Dr. Goeckeritz noted no abnormalities on examination. *Id.* He indicated Plaintiff had unexplained arthralgias and fatigue with an elevated ANA and recommended further testing for Sjogren's syndrome and other possible autoimmune diseases. Tr. at 325.

On November 7, 2011, Plaintiff presented to Palmetto Ophthalmology complaining of dry and burning eyes with excessive watering. Tr. at 327–28. Kenal Kenitkeur, M.D., diagnosed Sjogren's syndrome and Graves disease. Tr. at 328.

Dr. Hammett administered a Botox injection to treat Plaintiff's severe chronic migraines on November 30, 2011. Tr. at 334.

Dr. Goeckeritz followed up with Dr. Fuller on December 4, 2011. Tr. at 374–75. He indicated Plaintiff was unable to tolerate Cymbalta because of fatigue. Tr. at 374. Dr. Goeckeritz indicated he had performed comprehensive lab work that was all negative, including ANA test. *Id.* However, he indicated Plaintiff's vitamin D level was deficient. *Id.* He indicated Sjogren's should be ruled out as a possible diagnosis and that pain and fatigue were consistent with fibromyalgia and should be managed as such. Tr. at 375.

Plaintiff presented to Dr. Fuller with fever and lower back pain on December 5, 2011. Tr. at 347. Her temperature was elevated at 100.1 degrees. *Id.* She had very dry eyes. Tr. at 348. Dr. Fuller noted that Dr. Goeckeritz said all the tests were negative, but that the ophthalmologist was sure Plaintiff had Sjogren's syndrome. *Id.* He indicated he would refer Plaintiff to MUSC. *Id.*

On December 19, 2011, state agency medical consultant Robert Kukla, M.D., assessed Plaintiff as having the following limitations: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently climb ramps/stairs, stoop, kneel, crouch, and crawl; and occasionally climb ladders/ropes/scaffolds. Tr. at 72–74.

On December 20, 2011, state agency consultant Anna P. Williams, Ph. D., indicated Plaintiff had no medically-determinable mental impairment. Tr. at 71.

Plaintiff presented to Dr. Hammett with severe headaches, neck pain, and fatigue, on December 29, 2011. Tr. at 332–33. Dr. Hammett administered a greater occipital

nerve block and indicated Plaintiff should follow up for a Botox injection in February. Tr. at 330–31, 333.

Plaintiff presented to Dr. Fuller on January 5, 2012, with pink eye and lower back pain. Tr. at 345. Her temperature was elevated at 100 degrees. *Id.*

On January 25, 2012, an MRI of Plaintiff's lumbar spine indicated minor spondylotic changes and minimal broad protrusion at T12-L1, L4-5, and L5-S1, without significant spinal canal or foraminal compromise. Tr. at 397–98.

Plaintiff presented to MUSC's rheumatology department for a consultation on January 27, 2012. Tr. at 377–79. Edwin A. Smith, M.D. ("Dr. Smith"), assessed fibromyalgia and an autoimmune condition with positive SSA, ANA, and Graves disease. Tr. at 379. He indicated Plaintiff's dry eyes may be due to Sjogren's and to medications. *Id.* However, on January 31, 2012, Dr. Smith received Plaintiff's rheumatology lab results and MRI results and called Plaintiff to inform her that all tests were negative. Tr. at 380, 381.

Plaintiff followed up with Dr. Fuller on February 6, 2012, to discuss the MRI results.[1] Tr. at 382. Her temperature was slightly elevated at 99.7 degrees. *Id.*

Dr. Hammett administered Botox injections on February 22, 2012. Tr. at 436.

On February 23, 2012, state agency consultant Timothy Laskis, Ph. D., found that Plaintiff did not have a medically-determinable mental impairment. Tr. at 83.

Plaintiff presented to Dr. Fuller on April 30, 2012, complaining of jaw pain, neck pain, headache, and fever. Tr. at 384–86. Plaintiff complained of joint pain, muscle pain,

---

[1] Treatment notes from this visit are mostly illegible.

and joint swelling, particularly in her temporomandibular joints. Tr. at 384. Dr. Fuller indicated Plaintiff had "fairly severe fibromyalgia," but no back pain. *Id.* He assessed chronic fatigue syndrome, irritable bowel syndrome, fever of unknown origin, migraine, and primary fibromyalgia. Tr. at 386.

On May 14, 2012, Dr. Hammett administered a greater occipital nerve block. Tr. at 437–38. On May 25, 2012, he injected Plaintiff's facial nerves and neck muscles with Botox. Tr. at 439–40.

Plaintiff presented to Spencer J. Jenkins, M.D. ("Dr. Jenkins"), for abdominal pain on June 14, 2012. Tr. at 409–10. Plaintiff complained of constipation, bloating, nausea, and early satiety. Tr. at 409. Dr. Jenkins explained to Plaintiff that he felt her abdominal symptoms resulted from a combination of factors, including adhesions, tight skin from her history of tummy tuck surgery, subcutaneous and intraperitoneal adipose tissue, and constipation. Tr. at 410. He recommended exercise and gradual weight loss; encouraged her to keep her bowels moving with Miralax and a low dose of Benefiber; and ordered an esophagogastroduodenoscopy ("EGD"). *Id.*

The EGD indicated a normal esophagus; diffuse mildly erythematous mucosa in the stomach; and a normal duodenum. Tr. at 433. However, a stomach biopsy revealed Heliobacter pylori ("H. pylori") chronic active gastritis. Tr. at 434.

On July 3, 2012, Dr. Fuller noted the H. pylori finding and suggested it may be the source of Plaintiff's chronic pain and fevers. Tr. at 387. Plaintiff's temperature was elevated at 100 degrees. Tr. at 388. Dr. Fuller indicated diagnoses of chronic fatigue, gastroesophageal reflux disease ("GERD"), migraine, osteoarthritis, and primary

fibromyalgia and indicated Plaintiff's course was worsening. Tr. at 389. Plaintiff followed up with Dr. Fuller on August 1, 2012, complaining of headache, back pain, and achiness in her fingers. Tr. at 390. She endorsed muscle and joint pain, including new pain in her finger joints and knees. *Id.* Her temperature was slightly above normal at 99.5 degrees. Tr. at 391.

Plaintiff followed up with Dr. Hammett for Botox injections on August 24, 2012. Tr. at 441.

On August 28, 2012, Plaintiff reported to Dr. Jenkins that she was much better, but had some mild reflux symptoms, constipation, and bloating. Tr. at 411. Dr. Jenkins assessed Plaintiff as having H. pylori, GERD, and constipation and indicated he suspected irritable bowel disease, as well. Tr. at 412.

Plaintiff followed up with Dr. Fuller on August 29, 2012. Tr. at 392. Dr. Fuller noted Plaintiff had fever and fatigue and indicated the following "[a]t times, her notes on our new EMR suggest that she has not had fever, but the actual temperature reading always shows as HI. If any previous note has suggested no fever, she always has one, this is an error of omission due to the new EMR." *Id.* Plaintiff complained of severe, radiating lower back pain. *Id.* Dr. Fuller indicated he questioned the reading of the most recent MRI as normal because previous MRIs indicated chronic degenerative processes, which would not have improved. *Id.* Plaintiff's temperature was 99.4 degrees. Tr. at 393.

On September 25, 2012, Plaintiff presented to Dr. Hammett to review the results of her cervical MRI. Tr. at 442. She reported improvement in her headaches with Botox injections, but continued to report an average of two headaches per week. *Id.* Plaintiff's

cervical ROM was mildly limited and she had some moderate dystonic muscle activity in her cervical region. *Id.* Dr. Hammett prescribed Diazepam for muscle spasms. Tr. at 443.

Plaintiff complained to Dr. Spencer of bloating and early satiety on October 4, 2012. Tr. at 413. Dr. Spencer indicated he would again treat the H. pylori using Amoxicillin, Levaquin, and Omeprazole. Tr. at 414.

On October 22, 2012, Plaintiff indicated to Dr. Fuller that the neurologist reviewed the MRI and felt the reading was wrong. Tr. at 394. She indicated the neurologist felt the level of arthritis in her neck and low back had increased. *Id.* She also reported joint pain and swelling in her hands. *Id.*

Plaintiff presented to the emergency department at Providence Hospital with abdominal pain on November 2, 2012. Tr. at 429. The source of her pain was not identified, and Plaintiff was instructed to follow up with her gastroenterologist. *Id.*

Plaintiff again presented to Dr. Jenkins for abdominal pain on November 6, 2012. Tr. at 415. He recommended an abdominal ultrasound and a possible CT scan. Tr. at 416.

Dr. Hammett prepared a residual functional capacity ("RFC") assessment form on November 16, 2012, which is detailed below. Tr. at 403–05.

Plaintiff followed up with Dr. Jenkins on December 6, 2012. Tr. at 418. Dr. Jenkins indicated the abdominal ultrasound revealed no problems. *Id.* Plaintiff reported feeling better and having no significant reflux, abdominal pain, or constipation. *Id.* Dr. Jenkins ordered a urea breath test to determine whether H. pylori had been eradicated. Tr. at 419.

On December 7, 2012, Dr. Hammett administered Botox injections. Tr. at 444.

Plaintiff followed up with Dr. Fuller on January 2, 2013. Tr. at 447. She reported pain in her neck, low back, and various joints and muscles. *Id.*

Plaintiff underwent greater occipital nerve blocks on January 18, 2013. Tr. at 445–46.

On February 6, 2013, Plaintiff reported fever, fatigue, decreased energy, joint pain muscle pain, headache, anxiety, depression, and difficulty sleeping. Tr. at 450. Dr. Fuller indicated Plaintiff's course was worsening. Tr. at 452.

Plaintiff presented to Odette Anderson, M.D., ("Dr. Anderson") for an initial psychiatric consultation on March 4, 2013. Tr. at 453. She complained of feeling stressed over the prior six-month period and reported forgetfulness, irritability, anger, depressed mood, anxiety, and nervousness. *Id.* She also endorsed occasional bilateral hand tremors and pulling out her eyelashes. *Id.* Dr. Anderson provisionally diagnosed Plaintiff with adjustment disorder and indicated a need to rule out adjustment disorder with mixed anxiety and depressed mood, major depressive disorder, anxiety disorder, impulse-control disorders, and undifferentiated somatoform disorder. Tr. at 455. She indicated Plaintiff's prognosis was expected to be good given her intelligence, psychological mindedness, motivation, and previous apparent high functioning. *Id.*

Plaintiff followed up with Dr. Anderson on March 26, 2013. Tr. at 460. Dr. Anderson prescribed Percocet and Prilosec and instructed Plaintiff to follow up in one week. Tr. at 461. On April 15, 2013, Dr. Anderson prescribed Escitalopram and Vistaril and indicated a diagnosis of adjustment disorder. Tr. at 463.

C.    The Administrative Proceedings

    1.    The Administrative Hearing

        a.    Plaintiff's Testimony

At the hearing on May 1, 2013, Plaintiff testified she was 5'3" and weighed 160 pounds. Tr. at 32. She stated she was right-handed. *Id.* She indicated she lived in a two-story house with her three children, ages 17, 15, and 11. Tr. at 32–33. Plaintiff denied having difficulty climbing stairs. Tr. at 33. She confirmed she had a driver's license and stated she drove to the hearing. *Id.*

Plaintiff testified she was initially denied short-term disability benefits and attempted to return to work, but was unsuccessful. Tr. at 35. She stated she received short-term disability benefits from June to November 2011, but was subsequently denied long-term disability benefits. *Id.*

Plaintiff testified she worked for Bank of America from 1997 to 2006 as a customer service representative, a specialized services representative, and a claims department representative. Tr. at 36–37. She indicated she worked as a counselor and supervisor at a girls' home from 2007 to 2009. Tr. at 37. She stated she moved to South Carolina in 2009 and worked in customer service and technical support for Verizon. *Id.* Plaintiff indicated she had been promoted by all of her former employers. Tr. at 51.

Plaintiff testified she stopped working in February 2011 because of a combination of muscle spasms, migraines, fatigue, fever, and back pain. Tr. at 41. She stated she had extreme and unexplainable exhaustion. *Id.* She indicated she continued to experience that exhaustion and estimated she rested for three to four hours during the day. Tr. at 42.

Plaintiff testified that, at the time she stopped working, she had daily headaches with visual disturbance that caused her to be unable to see. *Id.* She indicated Dr. Hammett treated her headaches with Botox injections every three months. Tr. at 43. Plaintiff endorsed continued headaches twice weekly, but stated the Botox had helped tremendously. *Id.* Plaintiff indicated she was having muscle spasms in her neck, shoulders, arms, and back around the time she stopped working. Tr. at 43–44. She stated she had a breast reduction in September 2010. Tr. at 44. She indicated her recent treatment for muscle spasms included cortisone injections and Valium. *Id.* She testified she had back pain that radiated down the sides of her legs. Tr. at 45. She indicated she had chronic dry eye and that her eyes became painful, watery, and gritty. Tr. at 46.

Plaintiff testified she was seeing a psychiatrist for depression, anxiety, and mood disorders. Tr. at 50. She indicated that her treatment was helping to improve her symptoms. *Id.* She stated she received treatment every one to two weeks. Tr. at 52. She indicated her doctor prescribed Vistaril and another medication for her mental health symptoms. *Id.*

Plaintiff testified she was prescribed Percocet for pain, which made her tired and woozy. Tr. at 46. She indicated she could stand for no longer than 15 minutes at a time and could walk for five to 15 minutes. *Id.* She stated she experienced pain in her back, hands, arms, neck, and shoulders when attempting to lift. Tr. at 47. She indicated she had difficulty falling asleep and often awoke because of numbness in her hands and dryness in her eyes. *Id.*

15

Plaintiff testified she had seen Dr. Goeckeritz twice. Tr. at 53. She stated the first visit was to rule out Sjogren's and the second was to discuss lab work. *Id.* She indicated her primary care physician was treating her for fibromyalgia with Savella. Tr. at 54.

Plaintiff testified she transported her children to and from activities, but was not involved in their activities. Tr. at 57. She indicated she checked her children's homework to be sure they completed it correctly. Tr. at 48. She stated her children performed many of the household chores, but she performed some light chores, as well. Tr. at 48, 57. She testified she prepared small meals twice a week and shopped for groceries, but was unable to perform yard work. Tr. at 57–58.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Carey A. Washington reviewed the record and testified at the hearing. Tr. at 60–64. The VE categorized Plaintiff's PRW as a customer service representative as sedentary with a specific vocational preparation ("SVP") of five and a *Dictionary of Occupation Titles* ("*DOT*") number of 239.362-014; a group leader as light with a SVP of six and a *DOT* number of 195.227-010, and a customer complaint clerk as sedentary with an SVP of five and a *DOT* number of 241.367-014. Tr. at 60–61. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work involving lifting no more than 10 pounds occasionally and less than 10 pounds frequently and standing and walking no more than two hours out of an eight-hour workday. Tr. at 61. She asked the VE to further assume the individual could occasionally stoop, crouch, climb stairs and ramps, crawl, and work overhead with both upper extremities and could never climb ladders, ropes, or scaffolds. Tr. at 60–61. The VE

testified that the hypothetical individual could perform Plaintiff's PRW as a customer service representative and a customer complaint representative. Tr. at 61. The ALJ next asked the VE to assume that individual could not climb, stoop, kneel, crouch, or crawl; could perform frequent, but not constant reaching, handling, fingering, and feeling; and could not perform jobs requiring acute fine vision. Tr. at 62. The ALJ asked if such an individual could perform Plaintiff's PRW. Tr. at 63. The VE testified that those limitations would allow for performance of Plaintiff's PRW. *Id.* The ALJ asked the VE to further assume the hypothetical individual would miss at least two days of work per week because of headaches. *Id.* She asked if the individual could perform any jobs. *Id.* The VE testified there were no jobs in the competitive labor market that an individual could perform with such restrictions. *Id.*

Plaintiff's attorney asked the VE if the jobs of customer complaint clerk and customer service representative required above average persistence and pace. Tr. at 63. The VE testified that the supervisors at Verizon asked employees to meet certain specifications so there would have to be sustained concentration and the individual would be required to meet the pace of the supervisors. Tr. at 64. Plaintiff's attorney asked the VE to assume the hypothetical individual would have difficulty looking at a screen on a reliable and continuous basis. *Id.* He asked if that would affect the individual's ability to perform the jobs of customer complaint clerk and customer service representative. *Id.* The VE testified that such a restriction would limit performance of Plaintiff's PRW. *Id.* Plaintiff's attorney asked if Plaintiff's PRW required almost constant and continuous use of the eyes. *Id.* The VE testified it did. *Id.*

17

2.    The ALJ's Findings

In her decision dated June 27, 2013, the ALJ made the following findings of fact

and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016 (Ex. 4D).

2.    The claimant has not engaged in substantial gainful activity since February 6, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*) (Ex. 2D).

3.    The claimant has the following severe impairments: Grave's disease, migraine headaches, fibromyalgia, chronic fatigue syndrome, and cervical degenerative disc disease with brachial syndrome (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with no standing or walking longer than two hours out of an eight-hour workday. The claimant can occasionally stoop, crouch, and crawl, as those terms are defined by the Dictionary of Occupational Titles and the Selected Characteristics of Occupations. She can occasionally climb stairs and ramps. The claimant should never climb of ladders, ropes, or scaffolds. She can do only occasional overhead work with both upper extremities.

6.    The claimant is capable of performing past relevant work as a customer service representative and a customer complaint worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from February 6, 2011, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 14–22.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ declined to follow the treating physician rule;

18

2)      the ALJ failed to assess autoimmune and connective tissue diseases as severe impairments and made inconsistent findings regarding Graves disease;

3)      the ALJ did not evaluate symptoms of pain and fatigue in accordance with SSR 96-7p;

4)      the ALJ did not assess Plaintiff's RFC in accordance with SSR 96-8p; and

5)      the ALJ failed to perform the function-by-function analysis essential to find that Plaintiff was able to perform PRW.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.    Analysis

        1.    Treating Physician Rule

Plaintiff argues the ALJ erred in failing to accord controlling weight to the opinions of her treating physicians. [ECF No. 22 at 2]. She maintains that the opinions of Dr. Hammett and Dr. Fuller were supported by their treatment records, as well as the treatment notes of other providers. *Id.* at 2–8. She contends the ALJ gave inadequate reasons for discounting Dr. Hammett's and Dr. Fuller's opinions. Tr. at 8–14. She maintains that the ALJ must cite persuasive contradictory evidence to justify a decision not to accord controlling weight to a treating physician's opinion. *Id.* at 16. She argues that 20 C.F.R. § 404.1527(d)(2) requires an ALJ to accept a treating physician's opinion that is "well-supported by medically acceptable techniques" and is "not inconsistent with other evidence" in the record. *Id.* Finally, Plaintiff contends that, even if the ALJ provided substantial evidence to support her conclusion that the opinions of the treating

22

physicians were not entitled to controlling weight, he neglected to consider the factors required for evaluating all medical opinions under 20 C.F.R. § 404.1527(c).[4] *Id.* at 17–18.[5]

The Commissioner argues the ALJ reasonably weighed the medical opinions of record. [ECF No. 24 at 7]. She maintains the ALJ is not required to accept a treating physician's opinion. *Id.* She contends the ALJ adequately weighed the relevant factors and concluded that Dr. Hammett's opinion was not supported by the record. *Id.* at 8. She argues Dr. Fuller's letter is merely a generalized statement with no specific functional limitations; concerns an issue reserved to the Commissioner; and is not supported by his treatment notes. *Id.*

Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p, *quoting* 20 C.F.R. §§ 404.1527(a)(2). "An opinion that a claimant is 'disabled' or 'unable to work' is

---

[4] Although Plaintiff cites 20 C.F.R. § 404.1527(d)(2), it is likely that this citation was made in error. The language Plaintiff references is that found in 20 C.F.R. § 404.1527(c).

[5] Plaintiff also argues the ALJ violated the provision of 20 C.F.R. § 404.1512(e) that required her to recontact Dr. Hammett and Dr. Fuller for additional evidence and clarification. [ECF No. 22 at 14–15]. The court declines to address this argument because 20 C.F.R. § 404.1512(e) no longer states such a requirement. Plaintiff cites the version of 20 C.F.R. § 404.1512(e) applicable prior to March 26, 2012. However, the version of 20 C.F.R. § 404.1512(e) applicable at the time of the ALJ's decision did not include a requirement to recontact treating physicians and other medical sources. The Social Security Administration's (SSA's) duties were modified to require the agency to develop a claimant's medical history for at least the 12 months preceding the month in which the application was filed; to request evidence with the claimant's permission; and to obtain consultative examinations if the medical record is insufficient to make a disability determination. 20 C.F.R. § 404.1512(d), (e).

not a medical opinion but an administrative finding, and a physician's opinion on this ultimate issue is not entitled to special weight." *Dowdle v. Astrue*, C/A No. 2:10-2308-MBS, 2012 WL 887471, at *8 (D.S.C. March 15, 2012), citing 20 C.F.R. § 416.927(d); *see also* SSR 96-5p. Although treating physicians' opinions on issues reserved to the Commissioner are never entitled to controlling weight, they must still be evaluated. SSR 96-5p.

The opinion of a treating physician is entitled to deference. SSR 96-2p. If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If persuasive contradictory evidence exists, the ALJ may decline to accord controlling weight to the treating physician's opinion. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). However, even if the ALJ determines a treating physician's opinion is not entitled to controlling weight, the treating physician's opinion may still support a finding that the claimant is disabled and the ALJ is required to consider the opinion, along with all other medical opinions in the record, based on the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). SSR 96-2p. The factors to be considered include the following: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination and nature and extent of treatment relationship; supportability of the opinion based on the provider's treatment record; consistency with the record as a whole; specialization of the medical source; and other factors. 20 C.F.R. §§ 404.1527(c, 416.927(c); *see also Johnson*, 434 F.3d at 654. In all unfavorable and partially-favorable

decisions and in fully-favorable decisions based in part on treating sources' opinions, the

ALJ must specify the weight accorded to the treating source's opinion, cite reasons for

the weight accorded, and support her decision with evidence in the case record. SSR 96-

2p.

> a.    Dr. Hammett's Opinion

On December 29, 2011, Dr. Hammett wrote the following:

> Patient is unable to walk for more than 10 minutes without complete
> exertion. She is unable to stand for more than 20 minutes and unable to sit
> for longer than an hour before she becomes very fatigued. She complains
> that she "hurts all over" and thinks that she is so fatigued from her
> threshold of pain being reached daily. She is depressed and unable to cope
> with her medical conditions and her lack of ability to perform physically.
> She is unable to lift/carry greater than 20 lbs. She can not bend/reach/climb
> any extended distance due to her lack of strength, moderate-severe muscle
> and joint pain that is relentless in frequency. The patient is unable to work
> and should be eligible for disability. She has tried and failed multiple
> physical and occupational therapies. She has also participated in a
> comprehensive pain management program without sufficient results.

Tr. at 332.

The ALJ indicated she granted little weight to this opinion because it was outside

Dr. Hammett's scope of treatment. Tr. at 19. She wrote that Dr. Hammett's opinion

centered around limitations resulting from chronic pain due to autoimmune disorder, but

he treated Plaintiff for headaches. *Id.* She pointed out that Dr. Hammett's opinion was

inconsistent with Dr. Goeckeritz's and Dr. Smith's findings. *Id.* Finally, she indicated

that "rendering a claimant disabled and eligible for benefits is reserved to the

Commissioner." *Id.*

On November 16, 2012, Dr. Hammett indicated Plaintiff's basic strength was

compromised as follows: lift and/or carry 10 pounds; frequently lift and/or carry less than

10 pounds; unable to lift and/or carry any weight for two hours in an eight-hour day;

stand and/or walk for a total of less than two hours in an eight-hour day; sit for less than

six hours; unable to reach above shoulder level; occasionally balance; never climb, stoop,

kneel, crouch, and crawl; and limited reaching, handling, fingering, feeling, seeing, and

hearing. Tr. at 403. He described Plaintiff's impairments as follows:

> Patient has chronic pain and reaching (7), Handling (8), Fingering ([9],]
> Feeling (10) are impacted and cause increased pain with repetitive and
> consistant [sic] movement. Patient is extremely fatigued with minimal
> exertion. Vision is often blurred, sensitive to light. Sensitive to loud noises.
> (cont.) Patient is sensitive to dust, molds, pollens, trees, animal dander. Has
> allergic Rhinitis and upper respiratory bronco spasm (SOB) when exposed
> to these environmental allergens.
>
> Patient has dry mouth and dry eyes secondary to Sjogren and interferes
> with vision.

Tr. at 403–04. Dr. Hammett also described the principal clinical and laboratory findings

and syndrome that supported his opinion as follows:

> Patient has chronic pain related to an autoimmune disorder that is
> evidenced by a positive ANA and SSA. She is seeing an Rheumatologist
> for treatment and has been diagnosed with Fibromyalgia and Sjogrens. We
> are treating patient for Chronic Migraine with Intractable Migraine and
> patient has less headache-free days than headache days. Patient has severe
> neck pain and muscle spasms in the neck and shoulders with moderate to
> severe dystonic muscle spasms. She has been diagnosed with Spasmotic
> Torticollis. Active range of motion is limited. These diagnoses complicate
> patients functioning normally. She has decreased strength and tone in upper
> and lower extremities 3/5 x 4. Overcame with minimal resistance.

Tr. at 404. Dr. Hammett indicated Plaintiff has limited ability to sustain the following

mental activities and demands: understand, remember, and carry out an extensive variety

of technical and/or complex job instructions; understand, remember, and carry out

detailed but uncomplicated job instructions; understand, remember, and carry out simple

one- or two-step job instructions; interact with supervisors and coworkers, deal with the public; and maintain concentration and attention. He described the effect of Plaintiff's mental functioning on her capacity to perform work-related activities as follows: "Patient is only able to engage in very limited stress situations and engage in very limited Interpersonal relations due to ineffective coping skills secondary to chronic pain, Fatigue[,] decreased functional capacity and side effects/sedation of medications use to manage patient's symptoms effectively." Tr. at 405. He indicated the medical findings that supported his conclusions regarding Plaintiff's mental abilities were Plaintiff's emotional incontinence, chronic pain secondary to fibromyalgia, chronic fatigue, depression, and anxiety. *Id.*

The ALJ granted little weight to Dr. Hammett's November 2012 opinion because she found it to be inconsistent with the medical evidence of record as a whole and Plaintiff's function report. Tr. at 20.

The ALJ failed to provide sufficient reasons for her decision to grant little weight to Dr. Hammett's opinion. Plaintiff argues that the ALJ was required to give controlling weight to Dr. Hammett's opinion because it is not refuted by persuasive contradictory evidence. [ECF No. 22 at 16]. However, the ALJ cited sufficient persuasive and contradictory evidence by pointing out that Dr. Hammett's opinion was outside the scope of his treatment and inconsistent with other evidence in the record, including the findings of both rheumatologists who examined Plaintiff. *See* Tr. at 19–20. While the ALJ provided sufficient reasons for declining to accord controlling weight to Dr. Hammett's

opinion statements, she did not accord to them appropriate deference under the provisions of SSR 96-2p.

The ALJ also failed to proceed to the next required step of analyzing Dr. Hammett's opinions under the provisions of 20 C.F.R. §§ 404.1527(c) and 416.927(c). While the ALJ pointed out that Dr. Hammett provided opinions on evidence outside the scope of the treatment he provided to Plaintiff for her migraine headaches, she failed to acknowledge the part of Dr. Hammett's opinion that specifically referenced Plaintiff's limitations resulting from migraine headaches. *See* Tr. at 404. She also neglected to consider the supportability of Dr. Hammett's indication that Plaintiff continued to have fewer headache-free days than days in which see had headaches with his records and the consistency of his documentation of the effects of Plaintiff's headaches with the records of Plaintiff's other medical providers. *Compare id.*, *with* Tr. at 273 (reported daily headaches to Dr. Gunter on March 2, 2011), 340 (informed Dr. Hammett of daily headaches that lasted for four or more hours on July 29, 2011), 384 (complained of headaches to Dr. Fuller on April 30, 2012), 390 (reported headaches to Dr. Fuller on August 1, 2012), 442 (continued to report to Dr. Hammett an average of two headaches per week on September 25, 2012), 450 (complained of headaches to Dr. Fuller on February 6, 2013). She did not consider the nearly three-and-a-half year length of Plaintiff's treatment relationship with Dr. Hammett or the fact that Plaintiff visited him for treatment every one to three months during the relevant period. Tr. at 329–43, 355–56, 372–73, 402–07, 436–46. The ALJ also neglected to consider Dr. Hammett's specialization, which lends particular support to elements of his opinion having to do

with the effects of the impairments he treated. Plaintiff submitted evidence identifying Dr. Hammett as a neurologist and describing his specialties as vascular neurology and stroke, memory disorders and dementia, headache disorders, spasticity, and movement-based disorders. Tr. at 407. The SSA accords greater weight to the opinions of specialists about medical issues relating to their areas of specialty. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5). Therefore, the ALJ erred in failing to consider Dr. Hammett's field of practice and his particular specialty in treating headache disorders. In light of the ALJ's failure to consider the relevant factors under 20 C.F.R. §§ 404.1527(c) and 416.927(c), the court finds the ALJ did not properly evaluate Dr. Hammett's opinion statements.

b.    Dr. Fuller's Opinion

On July 6, 2011, Dr. Fuller wrote the following:

> I have been Ms. Trenisha Brown's family physician since 07/08/10. She has had a problem since then with chronic neck pain and shoulder pain. She has been seen by Dr. Bethea and has done physical therapy, which actually made the pain worse. Dr. Bethea's office notes are in her chart and can be viewed from her previous visits there. She has also been diagnosed by myself with fibromyalgia, chronic fatigue syndrome, chronic insomnia and chronic recurring fevers. She is being treated for all of this right now, and at this point I respectfully submit that she be allowed any disability time that she had been asked for as above, it has been clearly documented and should be clearly allowed.

Tr. at 371.

The ALJ accorded little weight to Dr. Fuller's opinion because she considered it to be a generalized statement with no specific limitations tied to specific impairments. Tr. at 20. She pointed out that determinations of disability are reserved to the Commissioner. *Id.* She also found that Dr. Fuller's opinion was inconsistent with his treatment notes. *Id.*

As with Dr. Hammett's opinion, the ALJ provided sufficient reasons for declining to accord Dr. Fuller's opinion controlling weight. She appropriately pointed out that Dr. Fuller specified no particular limitations, but instead offered a general opinion that Plaintiff was disabled. *See* Tr. at 20. Such opinions are not entitled to special weight. *See Dowdle* at *8; *see also* 20 C.F.R. § 416.927(d). However, the ALJ did not provide a sufficient enough basis for discounting Dr. Fuller's opinion because she neglected to proceed to the next step, which was to analyze the opinion using the factors in 20 C.F.R. §§ 404.1527(c) and 20 C.F.R. 416.927(c). The ALJ found Dr. Fuller's opinion was not consistent with his treatment notes that suggested Plaintiff had full ROM, normal strength, and normal gait and complained of no back pain or joint swelling on August 1, 2012. *See* Tr. at 20. However, in reaching this conclusion, the ALJ ignored Dr. Fuller's treatment notes that supported his opinion that Plaintiff's impairments and chronic pain would require she be allowed "disability time." *See* Tr. at 315 (Plaintiff presented with fever on June 14, 2011), 317 (Dr. Fuller diagnosed chronic fatigue syndrome on June, 8, 2011), 319 (Plaintiff reported lower back pain on May 19, 2011), 345 (Plaintiff had fever and lower back pain on January 5, 2012), 347 (Plaintiff reported fever and lower back pain on December 5, 2011), 353 (Plaintiff complained of being tired and had a fever on August 29, 2011), 384–86 (Plaintiff reported jaw pain, neck pain, headache, and fever and had joint pain, muscle pain, and swelling on April 30, 2012), 387 (Dr. Fuller noted Plaintiff had chronic pain and fevers on July 3, 2012), 390 (Plaintiff complained of headache, back pain, and achiness on August 1, 2012), 392 (Plaintiff noted fever, fatigue, and lower back pain on August 29, 2012), 447 (Plaintiff reported pain in her neck, low

back, joints, and muscles on January 2, 2013), 450 (Plaintiff's symptoms included fever, fatigue, decreased energy, joint pain, muscle pain, headache, anxiety, depression, and difficulty sleeping on February 6, 2013). She did not consider Plaintiff's nearly three-year treatment relationship with Dr. Fuller, that he treated her approximately every one to three months, or that he referred her to specialists and reviewed their reports. *See* Tr. at 308–22, 344–54, 371, 382–401, 447–52. The ALJ also neglected to consider the consistency between Dr. Fuller's opinion and that of Dr. Hammett. Although Plaintiff saw a number of specialists for consultations, she was generally treated by two physicians throughout the relevant period—Dr. Fuller and Dr. Hammett. Both of these treating doctors indicated that Plaintiff's impairments were so severe as to preclude her from working. *See* Tr. at 332, 371, 402–05. Despite consistent opinions from the only two doctors who treated Plaintiff throughout the period, the ALJ failed to address the consistency factor under 20 C.F.R. §§ 404.1527(c) and 416.927(c). In light of the foregoing, the court finds that the ALJ did not adequately consider the opinion evidence.

### 2. Autoimmune Disease, Connective Tissue Disease, and Graves Disease

Plaintiff argues the ALJ neglected to adequately address her severe impairments. [ECF No. 22 at 18–21]. She maintains the ALJ erred in finding she did not have an autoimmune disease. *Id.* at 19. She maintains that, while the ALJ found Graves disease to be a severe impairment, she conversely found that the record was "devoid of such evidence as it related to Plaintiff's allegation of Graves disease" and failed to include any restrictions in the RFC pertaining to Graves disease. *Id.* at 19–20, citing Tr. at 16.

Plaintiff contends her treating physicians diagnosed autoimmune diseases that included Graves disease, connective tissue disorder, and Sjogren's syndrome. *Id.* at 19.

The Commissioner argues the ALJ's conclusion that Plaintiff did not have an autoimmune or connective tissue disease was supported by the findings of Dr. Smith and Dr. Goeckeritz. [ECF No. 24 at 9].

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* SSR 96-3p. A non-severe impairment "must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, *citing* SSR 85-28; *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities).

Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

The presence of symptoms alone, such as pain, fatigue, shortness of breath, weakness, or nervousness, does not establish the existence of a severe impairment. SSR 96-3p. For an impairment to be severe, the impairment must be established by objective

medical evidence (i.e., signs and laboratory findings) and must reasonably be expected to produce the alleged symptoms. *Id.*; *see also* 20 C.F.R. §§ 404.1508, 416.908.

The ALJ found Plaintiff to have severe impairments of Graves disease, migraine headaches, fibromyalgia, chronic fatigue syndrome, and cervical degenerative disc disease with brachial syndrome. Tr. at 14.

### a.    Autoimmune and Connective Tissue Disease

The ALJ did not err in failing to consider autoimmune[6] and connective tissue disease in light of a lack of objective medical evidence to corroborate such diagnoses. *See* SSR 96-3p; *see also* 20 C.F.R. §§ 404.1508, 416.908. Although some evidence in the record suggests Plaintiff was diagnosed with these impairments, a thorough review of the record indicates these diagnoses were ruled out. On June 8, 2011, Dr. Fuller noted Plaintiff had elevated temperature, malaise, fatigue, myalgia, myositis, and positive ANA test and referred Plaintiff to a rheumatologist. Tr. at 315–16. Plaintiff again had a fever when she saw Dr. Fuller on August 29, 2011. Tr. at 353. Plaintiff visited rheumatologist Bruce Goeckeritz on October 26, 2011, who noted Plaintiff had unexplained arthralgia and fatigue and had a positive ANA test. Tr. at 325. He referred her for testing for Sjogren's syndrome and other possible autoimmune diseases. *Id.* On November 7, 2011,

---

[6] The ALJ recognized Graves disease as a severe impairment. Tr. at 14. Graves disease is an autoimmune disorder that leads to overactivity of the thyroid gland. A.D.A.M. Medical Encyclopedia [Internet]. Bethesda (MD): A.D.A.M., Inc.; ©1997–2015. Graves disease; [updated 2014 May 10; cited 2014 July 3]. Available from: www.nlm.nih.gov/medlineplus/ency/article/00358.htm. A court may take judicial notice of factual information located in postings on government websites. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (court may "properly take judicial notice of matters of public record").

Plaintiff saw ophthalmologist Dr. Kenitkeur, who diagnosed Sjogen's syndrome and Graves disease. Tr. at 328. However, in December, Dr. Goeckeritz informed Dr. Fuller that Plaintiff's lab work was all negative, including the ANA test, and that Sjogren's could be ruled out. Tr. at 374–75. He diagnosed fibromyalgia. *Id.* Plaintiff saw Dr. Fuller the next day, and Dr. Fuller indicated that he had received differing diagnoses from Dr. Goeckeritz and Dr. Kenitkeur. Tr. at 348. Dr. Fuller referred Plaintiff to MUSC for a second rheumatology evaluation. *Id.* On January 27, 2012, Dr. Smith assessed fibromyalgia and an autoimmune condition with positive SSA, ANA, and Graves disease. Tr. at 379. He indicated it was possible that Plaintiff had Sjogren's syndrome. *Id.* However, Plaintiff's rheumatology lab tests returned on January 31, 2012, and all were negative, including ANA. Tr. at 380.  Subsequent notes from Dr. Fuller indicate Plaintiff had "fairly severe fibromyalgia" and that he felt the diagnosis of H. pylori gastritis may explain Plaintiff's chronic pain and fever. Tr. at 387. In light of the foregoing, the ALJ reasonably concluded, based on the available evidence, that autoimmune diseases, wktht he exception of Graves disease, and connective tissue diseases were effectively ruled out as sources of Plaintiff's symptoms.

b.    Graves Disease

The ALJ indicated at step two that she found Graves disease[7] to be a severe impairment. Tr. at 14. At step three, she found the record did not support a finding that

---

[7] Possible symptoms of Graves disease include anxiety, difficulty concentrating, double vision, bulging eyeballs, eye irritation and tearing, fatigue, frequent bowel movements, goiter, heat intolerance, increased appetite, increased sweating, irregular menstrual periods, muscle weakness of the hips and shoulders, moodiness, nervousness, rapid or irregular heartbeat, restlessness and difficulty sleeping, shortness of breath with activity,

Plaintiff's Graves disease met the criteria for autoimmune disorders under Listing 14.00D. Tr. at 16.

The ALJ did not err in concluding that Plaintiff's Graves disease did not meet a Listing at step three. The record indicates Plaintiff was diagnosed with Graves disease many years before she stopped working and that it was effectively treated with radioactive iodine therapy. Tr. at 454. The record does not suggest Plaintiff had any significant thyroid problems during the relevant period. Therefore, the ALJ's conclusion that Graves disease did not meet Listing 14.00D for autoimmune disorders was supported by substantial evidence.

However, the ALJ did not adequately consider Plaintiff's diagnosis of Graves disease to the extent that she neglected to find Plaintiff's ability to perform basic work activities to be compromised. Plaintiff endorsed eye-related symptoms that appeared to be directly related to her diagnosis of Graves disease. Because an individual's capacity to see is a basic work activity, the ALJ should have considered the effect of Plaintiff's Graves disease on her vision. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b).

### 3.    Remaining Allegations of Error

Plaintiff argues the ALJ failed to follow the provisions of SSR 96-7p in evaluating her complaints of pain and fatigue. [ECF No. 22 at 22]. She maintains the ALJ ignored

---

tremor, weight gain or loss, chest pain, memory loss, weakness, and fatigue. *Id.* A.D.A.M. Medical Encyclopedia [Internet]. Bethesda (MD): A.D.A.M., Inc.; ©1997–2015. Graves disease; [updated 2014 May 10; cited 2014 July 3]. Available from: www.nlm.nih.gov/medlineplus/ency/article/00358.htm. Treatment for Graves disease may include radioactive iodine treatment or surgery, which destroy the thyroid gland. *Id.* After treatment, the individual often has an underactive thyroid, which should be treated with medication. *Id.* Most symptoms of Graves disease respond to treatment, but eye problems may worsen after radioactive iodine treatment. *Id.*

the requirements of SSR 96-8p in assessing her RFC. *Id.* at 24–25. She contends the ALJ did not follow the requirements of SSRs 82-62 and 96-8p, in finding that she could perform her PRW. [ECF No. 22 at 27].

In light of the court's decision that the case be remanded based on the ALJ's failure to adequately consider the treating physicians' opinions and Plaintiff's diagnosis of Graves disease and in consideration of the interconnectedness between these errors and the remaining allegations of error, Plaintiff's credibility, RFC, and ability to perform PRW should be reevaluated upon remand.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

*Shiva V. Hodges*

July 6, 2015                                          Shiva V. Hodges
Columbia, South Carolina                             United States Magistrate Judge